**H. Douglas MILLER, et al, Plaintiffs/Appellants,**

v.

**CAMPBELL COUNTY, et al, Defendants-third-party-plaintiffs/Appellees,**

v.

**UNITED STATES of America, et al, Third-party-defendants.**

Nos. 89–8100, 90–8014.

United States Court of Appeals, Tenth Circuit.

Sept. 24, 1991.

---

Gary L. Shockey of Spence, Moriarity & Schuster, Jackson, Wyo., for plaintiffs-appellants.

Rick A. Thompson (Richard J. Barrett, assisting on the brief), of Hathaway, Speight, Kunz, Trautwein & Barrett, Cheyenne, Wyo., for defendants-appellees.

Before MOORE, TACHA, and EBEL, Circuit Judges.

EBEL, Circuit Judge.

The plaintiffs-appellants, former homeowners in the Rawhide Village subdivision of Campbell County, Wyoming, seek damages for harm suffered when Rawhide Village was declared uninhabitable by the county commissioners of Campbell County. The plaintiffs filed suit against the Campbell County commissioners in the United States District Court for the District of Wyoming raising a battery of interrelated constitutional claims.[1] The district court granted the defendants' motion for summary judgment and dismissed all the plaintiffs' claims.

The plaintiffs on appeal argue that the district court erred in dismissing their Fifth Amendment takings claim and their Fourteenth Amendment substantive and procedural due process claims. We agree with the district court that the plaintiffs' takings claim is not ripe for review. We also find that the district court properly dismissed the plaintiffs' substantive and procedural due process claims. We therefore affirm the district court.

## FACTS

In February 1987, methane and hydrogen gasses were discovered seeping from the

---

1. In addition to naming the Campbell County commissioners as defendants, the plaintiffs sued the County of Campbell, the Board of County Commissioners of the County of Campbell, the Campbell County Sheriff's Department, the Campbell County Health Department, the Campbell County Fire Board, and the Campbell County Emergency Services Agency. These defen-

dants in turn filed third party actions against the United States, the Federal Emergency Management Agency, Julius W. Becton, Jr. (the Director of the Federal Emergency Management Agency), David P. Grier, IV (the Coordinating Officer for Rawhide Village for the Federal Emergency Management Agency), and Amax Coal Company.

ground in the southern end of the Rawhide Village subdivision located in Campbell County, Wyoming. On February 24 through 26, 1987, the county commissioners ordered the immediate evacuation of nine homes in the subdivision. On March 6, 1987, an additional twenty-two homes were ordered evacuated. Later, on March 26, all but seven of these thirty-one displaced homeowners were allowed to return to their homes.

By the end of May, it had been reported that a number of Rawhide residents were contracting strange maladies. In addition, the County Health Officer, Dr. George B. McMurtrey, sent a letter to the Governor of Wyoming suggesting that he declare the subdivision a disaster area based partly upon "information he had received from primary care physicians related to specific problems within the Rawhide Village subdivision." On May 29, the commissioners held an emergency meeting and passed a resolution declaring the subdivision uninhabitable. The commissioners nevertheless decided to wait until June 2 to make a final decision as to the timetable they would adopt for the evacuation. On June 2, the commissioners passed a resolution requiring that the subdivision be evacuated by July 31, 1987.

At the end of July, the Federal Emergency Management Authority ("FEMA") issued a statement to the effect that the subdivision was *not* uninhabitable. As a result, on July 28, 1987, the commissioners rescinded the July 31 deadline for evacuation. However, the commission left intact that portion of the June 2 resolution declaring the subdivision to be uninhabitable. Finally, on September 4, 1987, President Reagan declared the subdivision a disaster area, thereby paving the way for the disbursement of federal relief aid to the Rawhide residents.[2]

The plaintiffs contend that the Rawhide subdivision was not uninhabitable and that the commissioners declared the subdivision uninhabitable only in order to procure federal assistance from FEMA. They claim, therefore, that the defendants wrongly deprived them of their property in violation of the Constitution. The United States District Court for the District of Wyoming granted the defendants' motion for summary judgment and dismissed the plaintiffs' claims.[3] The plaintiffs now appeal to this court.[4]

## DISCUSSION

The plaintiffs have raised three constitutional claims. They claim first that the evacuation orders of May 29 and June 2 constituted a taking in violation of their Fifth Amendment rights as incorporated against the states through the Fourteenth Amendment. Second, they claim that their Fourteenth Amendment substantive due process rights were violated by the defendants' actions. Third, they claim that their Fourteenth Amendment procedural due process rights were similarly violated. We

---

**2.** It is not clear from the record whether a final evacuation order was entered.

**3.** There are two other related cases that were filed in the United States District Court for the District of Wyoming. The plaintiffs filed suit against the Amax Coal Company, alleging that it had caused the methane and hydrogen gas to leak into the subdivision. Amax operated a large coal mine operation located near the subdivision. This case was settled for an undisclosed amount on April 26, 1989.

In addition, one of the homeowners, H. Douglas Miller, filed suit against the defendants on the grounds that he was improperly denied access to his home and was arrested when he tried to gather some of his tools. The district court granted the defendants' motion for summary judgment and dismissed his claims. *See Miller*

*v. Campbell County*, 722 F.Supp. 687 (D.Wyo. 1989). In the instant case, the district court, in its Order granting summary judgment for the defendants, adopted the legal conclusions and factual findings from the earlier *Miller* case.

**4.** On their original notice of appeal, the plaintiffs used an "et al." designation for everyone but the first named plaintiff-appellant. However, the district court granted the plaintiffs' timely motion to extend their time to file the notice of appeal, and they filed a notice of appeal that correctly identified every party appealing the district court's summary judgment dismissal. The first defective notice of appeal was never dismissed. As a result, we have two separate docketing numbers for these two appeals.

will address each of these in turn.[5]

## I. Fifth Amendment Takings Claim

▆▆▆ The plaintiffs claim that the defendants violated their Fifth Amendment rights by "taking" the plaintiffs' homes from them. The district court dismissed this claim on the grounds that it was not yet ripe for review. We agree. The Fifth Amendment does not prohibit the government from taking its citizens' property; it merely prohibits the government from taking property without paying just compensation. U.S. Const. amend. V. Before a federal court can properly determine whether the state has violated the Fifth Amendment, the aggrieved property owner must show first that the state deprived him of his property, and second, that the state refused to compensate him for his loss. *See Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 194–97, 105 S.Ct. 3108, 3120–22, 87 L.Ed.2d 126 (1985). In those states that allow aggrieved property owners to bring an inverse condemnation action in order to recover compensation for property taken by the state, a Fifth Amendment takings claim is not ripe until the aggrieved property owner "has used the procedure and been denied just compensation." *Id.* at 195, 105 S.Ct. at 3121.

▆▆▆ In the instant case, the plaintiffs have pending under Wyoming law an inverse condemnation action to recover compensation for the loss of their homes. Appellee's Br. at 13. Because the plaintiffs have not yet been turned away empty-handed, it is not clear whether their property has been taken without just compensation. Therefore, under *Williamson County,* we affirm the district court holding that plaintiffs Fifth Amendment takings claim is not yet ripe for review in federal court.

## II. Due Process Claims

In addition to invoking the Just Compensation Clause of the Fifth Amendment, the plaintiffs contend that the defendants' actions violated their Fourteenth Amendment due process rights. The Fourteenth Amendment embodies three different protections: (1) a procedural due process protection requiring the state to provide individuals with some type of process before depriving them of their life, liberty, or property; (2) a substantive due process protection, which protects individuals from arbitrary acts that deprive them of life, liberty, or property; and (3) an incorporation of specific protections afforded by the Bill of Rights against the states. *See Daniels v. Williams,* 474 U.S. 327, 337, 106 S.Ct. 662, 677, 88 L.Ed.2d 662 (1986) (Stevens, J., concurring).

▆▆▆ Because the Just Compensation Clause of the Fifth Amendment imposes very specific obligations upon the government when it seeks to take private property, we are reluctant in the context of a factual situation that falls squarely within that clause to impose new and potentially inconsistent obligations upon the parties under the substantive or procedural components of the Due Process Clause. It is appropriate in this case to subsume the more generalized Fourteenth Amendment due process protections within the more particularized protections of the Just Compensation Clause.[6] The Supreme Court's decision in *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), supports our analysis. In *Graham,* the plaintiff accused law enforcement officers of injuring him during an investigatory stop. He claimed that the excessive force used violated both his Fourth Amendment and his Fourteenth Amendment substantive due process rights. The Supreme Court rejected his Fourteenth Amendment claim: "Because the Fourth Amendment provides an explicit textual source of con-

---

**5.** In light of our rulings on these issues, *infra,* we need not address the issue of qualified immunity.

**6.** We need not address whether a taking might ever violate substantive or procedural due process without violating the Just Compensation

Clause. We hold only that there is nothing in this record that would warrant a separate due process analysis over and above a consideration of the plaintiffs' more precise claims based on the Just Compensation Clause.

stitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Graham*, 490 U.S. at 395, 109 S.Ct. at 1871; *cf. Whitley v. Albers*, 475 U.S. 312, 327, 106 S.Ct. 1078, 1088, 89 L.Ed.2d 251 (1986) (refusing to consider Fourteenth Amendment Due Process claim by prison inmate for excessive force because Eighth Amendment "serves as the primary source of substantive protection to convicted prisoners" in such cases).

We are aware of the Ninth Circuit case of *Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 882 F.2d 1398 (9th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990). There, the plaintiffs alleged that their privately owned dam and lake was destroyed by California authorities in violation of the Fifth Amendment as well as the substantive and procedural branches of the Fourteenth Amendment Due Process Clause. The Ninth Circuit dismissed the plaintiffs' takings claim as being unripe. However, it held that the plaintiffs' procedural and substantive due process claims were viable.[7] Because the facts of that case are so different from the facts of this case, we cannot say that we are in conflict with *Sinaloa Lake*. All that can be said is that under the facts of our case we conclude that the Just Compensation analysis is controlling whereas in *Sinaloa Lake* the Ninth Circuit felt that the conduct there went beyond the penumbra of the Just Compensation Clause.

In any event, even if we were to evaluate plaintiffs' substantive and procedural due process claims separately from their Just Compensation claim, we would find no due process violation here.

■ The Supreme Court has stated that "due process ordinarily requires an opportunity for 'some kind of hearing' prior to the deprivation of a significant property interest." *Hodel v. Virginia Surface Mining and Recl. Ass'n.* 452 U.S. 264, 299, 101 S.Ct. 2352, 2372, 69 L.Ed.2d 1 (1981) (citing *Parratt v. Taylor*, 451 U.S. 527, 540, 101 S.Ct. 1908, 1915, 68 L.Ed.2d 420 (1981) *overruled on other grounds by Daniels*, 474 U.S. at 330–31, 106 S.Ct. at 664; *Boddie v. Connecticut*, 401 U.S. 371, 374, 91 S.Ct. 780, 784, 28 L.Ed.2d 113 (1971)). However, where the state is confronted with an emergency, it may deprive an individual of his or her property without first providing a hearing. *Hodel v. Virginia Surface Mining and Recl. Ass'n*, 452 U.S. at 299–300, 101 S.Ct. at 2372 (1981).

■ The facts of this case do not bear out the defendants' claim that they were confronted with an emergency of such magnitude that they could totally avoid any procedural due process obligations that they may have under the Fourteenth Amendment. Although the plaintiffs were told on May 29 and June 2 that their homes were uninhabitable, the evacuation was not set to occur until July 31—two months later. This two-month long delay belies the defendants' claim that they were confronted with such an emergency that a predeprivation hearing could not be provided.[8]

---

**7.** The Ninth Circuit attempted to distinguish *Graham: "Graham* does not, however, bar substantive due process analysis altogether. A plaintiff may still state a claim for violation of substantive due process where it is alleged that the government has used its power in an abusive, irrational or malicious way in a setting *not encompassed by some other enumerated right." Sinaloa*, 882 F.2d at 1408–09 n. 10. (Emphasis added). In the instant case, the plaintiffs' due process claims are encompassed within the Just Compensation Clause.

**8.** In determining that the emergency exception was applicable, the district court placed a great deal of weight on the plaintiffs' pleadings filed in the Amax case. In the Amax case, the plain-

tiffs sued the Amax Coal Company alleging that Amax was responsible for the significant seepage of a substantial amount of methane and hydrogen gasses into the subdivision. The plaintiffs claimed that as a result, they suffered substantial property loss, personal injuries, and emotional injuries. Here, the district court believed that these pleadings established that the commissioners were confronted with an emergency.

The plaintiffs' pleadings from the Amax case constitutes some evidence that there was an emergency. However, because the district court was deciding a summary judgment motion, it was required to resolve all conflicts in the evidence in favor of the nonmoving party—in this case the plaintiffs. Because the prior pleadings

■ Nevertheless, it is clear that plaintiffs had at least two opportunities to present their position orally to the county commissioners, and they had ample notice of the pending orders to vacate such that they could have made written submissions to the county commissioners had they so wished.[9] This process, which was available to plaintiffs, must be considered in the context that the defendants had a legitimate governmental duty to act in this situation with some urgency. Further, the condemnation process (or a revival of plaintiffs' Just Compensation claim should condemnation prove to be inadequate) offers the plaintiffs a sufficient post-deprivation hearing to obtain just compensation for the loss of their property. In this particular context, we hold that plaintiffs were offered adequate procedural due process.

■ With regard to plaintiffs' substantive due process claims, we similarly find no violation. The defendants had an obvious need to act with considerable dispatch because of the potential danger to its citizens. The defendants' actions were reasonable and measured, with appropriate concern for the situation and the interests of all involved. We cannot say on this record that the defendants' actions were arbitrary, capricious and unreasonable.

## CONCLUSION

The district court order is AFFIRMED.

---

evidence taken from the Amax case conflicted with the evidence supporting the plaintiffs' claim that there was no emergency, the district court should not have granted summary judgment for defendants on the basis of the emergency exception.

9. The taking did not occur when the resolutions were adopted; rather the taking occurred when the plaintiffs were actually required permanently to vacate their premises. See *Kirby Forest Industries v. United States*, 467 U.S. 1, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984). There, the Court rejected the aggrieved property owner's claim that the taking occurred when the government initiated condemnation proceedings by filing a notice of *lis pendens. Id.* at 14–15, 104 S.Ct. at 2196. Instead, the Court held that the taking occurred at the time the title was transferred to the government in exchange for compensation. The Court noted that until the title passed, the government's "interference with petitioner's property interests [was not] severe enough to give rise to a taking...." *Id.*